1  EVELYNN N. TRAN, GENERAL COUNSEL (SBN 203473)
   PAUL D. AHN, SENIOR ASSISTANT COUNSEL (SBN 244842)
2  SANTA CLARA VALLEY TRANSPORTATION AUTHORITY
   3331 North First Street, C-2
3  San Jose, CA 95134-1906
   Telephone: (408) 321-5550
4  Facsimile: (408) 321-7547

5  ARTHUR A. HARTINGER (SBN 121521)
   ahartinger@publiclawgroup.com
6  LINDA ROSS (SBN 133874)
   lross@publiclawgroup.com
7  GEOFFREY SPELLBERG (SBN 121079)
   gspellberg@publiclawgroup.com
8  SPENCER J. WILSON (SBN 266938)
   swilson@publiclawgroup.com
9  RENNE PUBLIC LAW GROUP
   350 Sansome Street, Suite 300
10 San Francisco, California 94104
   Telephone: (415) 848-7200
11 Facsimile: (415) 848-7230

12 Attorneys for Defendant
   SANTA CLARA VALLEY
13 TRANSPORTATION AUTHORITY

14

15              IN THE UNITED STATES DISTRICT COURT

16           FOR THE NORTHERN DISTRICT OF CALIFORNIA

17

18 ROBERT ESTORGA,                          Case No. 5:16-cv-02668-BLF

19          Plaintiff,                      **DEFENDANT SANTA CLARA VALLEY
                                            TRANSPORTATION AUTHORITY'S
20 v.                                       NOTICE OF MOTION AND MOTION
                                            FOR SUMMARY JUDGMENT OR
21 SANTA CLARA VALLEY TRANSPORTATION        ALTERNATIVELY, PARTIAL
   AUTHORITY                                SUMMARY JUDGMENT;
22                                          MEMORANDUM OF POINTS AND
          Defendant.                        AUTHORITIES**

23
                                            Date:   November 1, 2018
24                                          Time:   9:00 a.m.
                                            Dept:   Courtroom 3, 5th Floor
25                                          Judge:  Hon. Beth Labson Freeman

26                                          Action Filed:  May 17, 2016
                                            Trial Date:    February 11, 2019
27

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ..................................................................................................... vi

I.  INTRODUCTION ..................................................................................................1

II. KEY BACKGROUND PRINCIPLES REGARDING THE FLSA AND
    PORTAL-TO-PORTAL ACT ................................................................................2

III. STATEMENT OF FACTS .....................................................................................4

    A.  Parties to This Action ................................................................................4

    B.  Selection of Runs. .....................................................................................5

    C.  Travel Time ...............................................................................................6

        1.  Start-End Travel ............................................................................7

        2.  Split-Shift Travel ..........................................................................9

    D.  *Rai* Litigation ..........................................................................................10

    E.  Claims Brought by Robert Estorga ..........................................................12

IV. STANDARD OF REVIEW ..................................................................................12

V.  ARGUMENT .......................................................................................................12

    A.  Start-End Travel Time .............................................................................12

        1.  Start-End Travel Time Does Not Constitute Hours Worked ........12

        2.  *Gilmer* is an Outlier Decision Which Was Wrongly Decided
            and is In Any Event Easily Distinguishable ................................15

            a.  *Gilmer* was Wrongly Decided ..........................................15

            b.  *Gilmer* is Easily Distinguishable ....................................17

                i.   Plaintiffs Are Not Required to Use SCVTA
                     Transport for Their Commute, Nor are They
                     Required to Travel to Their Home Yard Before
                     or After a Shift ...................................................17

                ii.  Unlike *Gilmer*, the Parties' CBA Does Not Treat
                     Travel Time as Compensable ..............................18

    B.  Plaintiffs Are Not Entitled to Additional Compensation for Split-Shift
        Travel Time Because Such Time is Non-Compensable Under The
        FLSA .......................................................................................................19

    C.  SCVTA is Entitled to Use Elapsed Time and Other Premium Payments
        to Offset any FLSA Overtime Liability ...................................................20

RENNE PUBLIC LAW GROUP
Attorneys at Law

**TABLE OF CONTENTS (CONT'D)**

Page

D.   SCVTA Acted in Good Faith and There is No Basis for a Finding
     that it Acted Willfully or Recklessly ..................................................................23

     1.   SCVTA's Good Faith Defense ..........................................................23

     2.   Plaintiffs Cannot Prove Willfulness ................................................24

VI.   CONCLUSION..............................................................................................25

RENNE PUBLIC LAW GROUP
Attorneys at Law

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. United States*,
32 F.3d 1571 (Fed. Cir. 1994) ............................................................................23

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680 (1946) ............................................................................................3

*Balestrieri v. Menlo Park Fire Prot. Dist.*,
800 F.3d 1094 (9th Cir. Sep. 4, 2015) ..........................................................13, 16

*Barrentine v. Ark.-Best Freight Sys., Inc.*,
450 U.S. 728 (1981) ..........................................................................................11

*Beidleman v. City of Modesto*,
No. 1:16-cv-01100-DAD-SKO, 2018 WL 1305713 (E.D. Cal. Mar. 13, 2018) ........11

*Bonilla v. Baker Concrete Const., Inc.*,
487 F.3d 1340 (11th Cir. 2007) ....................................................................14, 17

*Bratt v. Cnty. of Los Angeles*,
912 F.2d 1066 (9th Cir. 1990) ............................................................................23

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S. Ct. 2548 (1986) ..................................................................12

*Connor v. Celanese, Ltd.*,
428 F. Supp. 2d 628 (S.D. Tex. 2006) ..................................................................22

*Eisenberg v. Ins. Co. of N. Am.*,
815 F.2d 1285 (9th Cir. 1987) ............................................................................12

*Gilmer v. Alameda-Contra Costa Transit Dist.*,
No. C08-05186-CW, 2010 WL 289299 (N.D. Cal. Jan. 15, 2010) ................... *passim*

*Griffin v. S & B Engineers & Constructors*,
507 F. App'x 377, 378 (5th Cir. 2013) ..................................................................16

*Haro v. City of Los Angeles*,
745 F.3d 1249 (9th Cir. 2014) ............................................................................21

*Imada v. City of Hercules*,
138 F.3d 1294 (9th Cir. 1998) ............................................................................13

*Integrity Staffing Solutions, Inc. v. Busk*,
__ U.S. __, 135 S. Ct. 513 (2014) ................................................................... *passim*

-iii-

1

## <u>TABLE OF AUTHORITIES (CONT'D)</u>

2

**Page(s)**

3

*Kuebel v. Black & Decker, Inc.*,
    643 F.3d 352 (2d Cir. 2011) ...................................................................................13

4

*Local 589, Amalgamated Transit Union v. Massachusetts Bay Transportation*
    *Authority (MBTA)*,
    94 F.Supp.3d 47 (D. Mass. 2015) ................................................................14, 15, 16

5

6

*Margulies v. Tri-County Metropolitan Transp. Dist. of Oregon*,
    No. 3:13-cv-00475-PK, 2015 WL 4066654 (D. Ore. July 2, 2015) ..............14, 18, 19

7

8

*McLaughlin v. Richland Shoe Co.*,
    486 U.S. 128 (1988).............................................................................................24

9

*Mitchell v. JCG Industries, Inc.*,
    745 F.3d 837 (7th Cir. 2014) ...............................................................................19

10

11

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
    210 F.3d 1099 (9th Cir. 2000) .............................................................................24

12

*Pacific Merchant Shipping Ass'n v. Aubry*,
    918 F.2d 1409 (9th Cir. 1990) ...............................................................................4

13

14

*Pietrzycki v. Heights Tower Service, Inc.*,
    290 F.Supp.3d 822 (N.D. Ill. 2017) ...................................................................4, 13

15

16

*Rai v. Santa Clara Valley Transportation Authority*,
    Case No. 5:12-vc-04344-PSG (N.D. Cal, filed Aug. 17, 2012) ........................ *passim*

17

18

*Rutti v. Lojack Corp.*,
    596 F.3d 1046 (9th Cir. 2010) .............................................................................13

19

*Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*,
    321 U.S. 590 (1944)..............................................................................................3

20

21

*United Transp. Union Local 1745 v. City of Albuquerque*,
    178 F.3d 1109 (10th Cir. 1999) ...................................................................... *passim*

22

23

*Yue Zhou v. Wang's Rest.*,
    No. 05-cv-0279 PVT, 2007 WL 2298046 (N.D. Cal. Aug. 8, 2007) .........................11

24

25

26

27

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

## <u>TABLE OF AUTHORITIES (CONT'D)</u>

**Page(s)**

**Statutes**

Fair Labor Standards Act (FLSA) 29 U.S.C. §§ 201, *et seq.*
   29 U.S.C. § 203(g) ...................................................................................... 13
   29 U.S.C. § 207 ................................................................................... *passim*
   29 U.S.C. § 207(e) ................................................................ 20, 21, 22, 23
   29 U.S.C. § 207(h) ............................................................... 4, 20, 22, 23
   29 U.S.C. § 216(b) ...................................................................................... 23
   29 U.S.C. § 254 ................................................................ 3, 13, 14, 15, 18
   29 U.S.C. § 260 ........................................................................................... 23

California Public Utilities Code
   § 100000, *et seq.* ......................................................................................... 4

**Other Authorities**

Code of Federal Regulations
   29 C.F.R. § 785.15 ..................................................................................... 20
   29 C.F.R. § 785.16 .............................................................................. 19, 20
   29 C.F.R. § 790.7 ......................................................................................... 3
   29 C.F.R. § 790.15 ..................................................................................... 23

Federal Rules of Civil Procedure
   Rule 23 ........................................................................................................ 10
   Rule 56(a) .................................................................................................... 12

RENNE PUBLIC LAW GROUP
Attorneys at Law

**TO ALL PARTIES, COLLECTIVE ACTION PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on November 1, 2018, at 9:00 a.m., or as soon thereafter as this matter may be heard in Courtroom 3 – 5th Floor, at the San Jose Courthouse, 280 South First Street, San Jose, California 95113, Defendant Santa Clara Valley Transportation Authority ("Defendant" or "SCVTA") will, and hereby does make the following motion:

Pursuant to Rule 56, SCVTA moves for summary judgment or, in the alternative, partial summary judgment with respect to specific issues and claims as specified herein, on the grounds that there are no triable issues of material fact and Defendant is entitled to summary judgment, or alternatively partial summary judgment, as a matter of law. The specific issues and claims subject to summary judgment or partial summary judgment are listed in SCVTA's accompanying Memorandum of Points and Authorities, and are incorporated in this Notice by reference as though fully set forth herein, and include Plaintiffs' claims for the following: (a) "start-end travel time;" (b) "split-shift travel time;" and (c) an extended statute of limitations and liquidated damages based on alleged "willfulness" and lack of good faith. SCVTA requests summary judgment, or alternatively partial summary judgment, on each and every cause of action alleged in Plaintiffs' First Amended Complaint.

This Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities filed concurrently herewith; the Declarations of Geoffrey Spellberg, Kermit Cuff, Paul Ahn, Inez Evans, Louis Miller, and Cathy Quail, including all exhibits attached thereto, filed concurrently herewith; on all other pleadings and papers on file in this action; and on any oral argument presented during the hearing on this Motion.

Dated: September 13, 2018                    RENNE PUBLIC LAW GROUP LLP


By:_____/s/Geoffrey Spellberg_____
      Geoffrey Spellberg

Attorneys for Defendant
SANTA CLARA VALLEY TRANSPORTATION
AUTHORITY

-vi-

RENNE PUBLIC LAW GROUP
Attorneys at Law

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**

## I.     INTRODUCTION

Plaintiff Robert Estorga is a former transit operator who drove buses for Defendant Santa Clara Valley Transportation Authority ("SCVTA"). He brings this Fair Labor Standards Act ("FLSA") collective action with 14 opt-in plaintiffs alleging SCVTA failed to pay the Plaintiffs overtime premiums in certain circumstances.[1]

The Plaintiff bus operators are unionized employees represented by the Amalgamated Transit Union ("ATU" or "Union"). On behalf the its members, the Union has negotiated numerous premium payments, incentive payments, and other forms of special compensation that each of the bus operators receives depending on the particular characteristic of the bus runs they operate. One of the myriad pay benefits negotiated by ATU on behalf of the bus drivers is travel time pay. Two types of travel time pay—"start-end travel" and "split-shift travel" are at the heart of this case.

First, Plaintiffs claim they are owed overtime premiums for "start-end travel" pay – a benefit SCVTA provides the operators for certain commute time when a bus run starts or ends away from the operator's home division. Pursuant to the collective bargaining agreement negotiated by the ATU, SCVTA pays the operators an agreed-upon amount based on the time it would take to travel via SCVTA transport between the operators' home yard and the start or end point of the operators' shift. Significantly, the operators are not required to start or end their shift at the home yard. Under the existing agreement, SCVTA still pays this "start-end travel" in situations where the operators commute directly between their homes and the starting/ending points, which is often the case. Courts throughout this country have rejected similar claims for start-end travel overtime in near uniformity. The sole outlier case addressing this topic has been widely criticized and is, in any event, readily distinguishable.

Plaintiffs also seek additional compensation for "split-shift travel" pay, where SCVTA provides operators assigned to a split shift an agreed-upon payment for travelling between an end

---

[1] Defendant has filed a motion to dismiss certain plaintiffs who refused to appear for deposition during the discovery process. (Dkt. 87.) That motion will be heard October 4, 2018 and may result in the dismissal of four of the current 15 plaintiffs.

RENNE PUBLIC LAW GROUP
Attorneys at Law

point of the first run and a geographically different start point of the second run. Like the start-end travel pay, the split-shift travel benefit is an agreed-upon amount based on the time it would take to travel between the two geographically diverse locations. Plaintiffs contend they are entitled to an additional halftime premium, but this this time is not compensable as such under the FLSA. Moreover, SCVTA already provides myriad premium and incentive payments that are more generous than those required under the FLSA and a federal court has already entered judgment finding that SCVTA's practice regarding this split shift travel pay conforms with the FLSA.

The evidence in this case clearly demonstrates that the operators are compensated in compliance with the FLSA. This Court should therefore find:

1.     SCVTA does not owe any operator FLSA overtime premiums for start-end travel, because such travel time is ordinary home-to-work commute time.

2.     SCVTA does not owe any operator FLSA overtime premiums for split-shift travel, because it does not constitute hours worked under the FLSA.

3.     Alternatively, if this Court determines either start-end or split-shift travel time is compensable under the FLSA, SCVTA may offset any liability with the overtime premiums it pays which are more generous than what is required by the FLSA.

4.     The record clearly demonstrates at all times SCVTA acted in good faith and there is no evidence SCVTA willfully violated the FLSA. Accordingly, Plaintiffs are not entitled to liquidated damages and their claims are subject to a two-year statute of limitations.

## II.     KEY BACKGROUND PRINCIPLES REGARDING THE FLSA AND PORTAL-TO-PORTAL ACT

Under the FLSA, non-exempt employees must be paid overtime at the rate of one and one-half times the "regular rate of pay" for all hours worked in excess of 40 in a workweek. 29 U.S.C. § 207.[2]  When Congress first passed the FLSA, it did not define the terms "work" or "workweek," leaving them to judicial interpretation. *See Integrity Staffing Solutions, Inc. v. Busk*, __ U.S. __, 135

---

[2] There is no dispute in this case that all of the Plaintiffs are non-exempt and entitled to overtime under the FLSA.

RENNE PUBLIC LAW GROUP
Attorneys at Law

S. Ct. 513, 516 (2014). Early U.S. Supreme Court decisions interpreting the statute provided expansive definitions of "work" and "workweek." *Integrity Staffing*, 135 S. Ct. at 516. One seminal case defined work as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944). Accordingly, ordinary travel time from home to work was not considered hours worked. *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 691 (1946).

The Court's expansive definitions of "work" and "workweek," resulted in "a flood of litigation," which created "wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers." *Integrity Staffing*, 135 S. Ct. at 516-517 (citing *Tennessee Coal, Iron & R. Co. v. Muscola Local No. 123*, 321 U.S. 590, 598 (1944); *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680 (1946)). In order to address the "emergency" created by the litigation resulting from the Court's broad interpretation of the FLSA, Congress passed the Portal-to-Portal Act ("Portal Act"). *Integrity Staffing*, 135 S. Ct. at 516-517. The Portal Act clarifies that the following preliminary and postliminary activities are not compensable under the FLSA, and therefore do not qualify as hours "worked":

> (1)    Walking, riding or travelling to or from the actual place of performance of the principal activity or activities, which such employee is employed to perform, and
>
> (2)    Activities which are preliminary to or postliminary to said activity or activities,  which occur prior to the time of any particular work day at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities. . . .

29 U.S.C. §§ 254(a)(1), (2).

Significantly, home-to-work travel never qualifies as compensable working time under the FLSA. Section 254(b) of the Portal Act includes an exception which reimposes overtime liability in narrow circumstances where an employer pays its employees for non-compensable work through "custom or contract." 29 U.S.C. § 254(b). However, this exception is narrow and only applies to work that would be compensable if not for the Portal Act. 29 C.F.R. § 790.7. The exemption does

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  not transform an employer's custom or contract of paying an employee for work that has always

2  been non-compensable under the FLSA—such as home-to-work travel—into compensable work.

3  *See id.*; *Pietrzycki v. Heights Tower Service, Inc.*, 290 F.Supp.3d 822, 834 (N.D. Ill. 2017).

4       The FLSA acts as a floor and not a ceiling and permits employers to provide employees

5  additional compensation more generous than that required under the FLSA. *See Pacific Merchant*

6  *Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1425 (9th Cir. 1990). Such arrangements are particularly

7  common with public employers, where the workforce is unionized and the employees are

8  compensated pursuant to a collective bargaining agreement providing various premium and

9  incentive payments. Under the FLSA, some of this additional compensation provided to employees,

10  which is not otherwise required by the FLSA, may be credited against any overtime owed under the

11  Act. 29 U.S.C. § 207(h).

12  **III.    STATEMENT OF FACTS**

13      **A.    Parties to This Action**

14       SCVTA is a transit agency formed by the State Legislature in 1972 under the California

15  Public Utilities Code. *See* Cal. Pub. Utilities Code § 100000, *et seq*. SCVTA operates motor coach

16  and light rail vehicles throughout Santa Clara County and connects to other local and regional

17  transit systems.

18       The Plaintiffs to this action are each bus operators employed by SCVTA. SCVTA operates

19  three bus divisions, serving approximately 121,000 passengers per day. (Declaration of Inez Evans

20  ¶ 3.) Each division has a bus "yard" which serves as the home base for the bus operators assigned to

21  that division. (Evans Decl. ¶ 4.) Approximately 923 bus operators are assigned to "runs" to service

22  the public. (Evans Decl. ¶¶ 3, 5.) These runs are "cut" pursuant to the state-of-the-art public transit

23  system called Trapeze. (Declaration of Kermit Cuff ¶ 6.) The Trapeze system has been used for

24  many years and one of the factors used in cutting the runs includes various agreed-upon payment

25  and time amounts in the collective bargaining agreement. (Cuff Decl. ¶ 6; Declaration of Geoffrey

26  Spellberg Ex. O.)

27       ATU is the exclusive bargaining representative for the transit operators. SCVTA and ATU

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    have agreed to a comprehensive collective bargaining agreement ("CBA") that establishes wages,

2    hours, and all other terms and conditions of employment affecting the transit operators. (Evans

3    Decl. ¶ 6, Ex. A ("CBA").)

4    **B.      Selection of Runs.**

5          Pursuant to a longstanding practice that is contractually agreed upon in the CBA, the

6    operators bid quarterly on the available runs based on seniority. (Cuff Decl. ¶ 7.) Some runs

7    originate in the yard to which an operator is assigned and others begin at a "relief" point, away from

8    the assigned yard. (Cuff Decl. ¶ 9.) Some runs are straight runs, where the operator drives a single

9    route throughout the day, while others are "split shifts," where the operator drives two separate

10   shorter routes during the day. Split shifts are typically separated by a long break in between the two

11   shifts, during which the operator is completely relieved from duty. (Cuff Decl. ¶¶ 7, 9.)

12         Some drivers are not assigned to a particular shift, but are rather assigned to the "extra

13   board." (Cuff Decl. ¶ 7.) Some extra board operators are assigned as needed to operate specific

14   routes due to other operators' absences. (Cuff Decl. ¶ 7.) Extra board operators not assigned to

15   cover a particular run are provided an assignment known as "on point" – meaning that the drivers

16   show up to the yard and sit "on point" where they are assigned various duties throughout the day,

17   depending on the particular needs of SCVTA. When not assigned to a particular task, the on-point

18   drivers are still paid to wait in the operator room, where they can read, rest, use the computers,

19   exercise, and so forth until they are given an assignment. (Evans Decl. ¶ 5.) All operators who

20   report to work are guaranteed at least eight hours of pay each day, even if they work fewer hours.

21   (Evans Decl. ¶ 6; Declaration of Cathy Quail ¶ 4(a).)

22         Each quarter, SCVTA posts run synopses, which the operators use to inform their bidding

23   decisions. (Cuff Decl. ¶¶ 7, 8.) The run synopses provide detailed information about the runs and

24   the number of hours of compensation the operators will receive for operating these runs. (Cuff Decl.

25   ¶ 8, Ex. A.) The run synopses detail whether a run is a straight run or a split shift and further detail

26   the days of the runs, the start and end times of the runs, and the location of the start and end points.

27   (Cuff Decl. ¶ 8.) Additionally, the synopses detail various premium and incentive payments the

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

operators will receive for operating each run, including without limitation:[3]

> Travel Time Pay—SCVTA provides travel time pay to operators who go on or off duty at some point other than their home terminal. It also provides travel time pay to operators driving a split run where the second part of the run begins at a different point than the point where the first part of the run ended. (CBA 75-76; Cuff Decl. ¶¶ 11, 14.)

> Elapsed Time—Elapsed time is a premium payment provided when spread time exceeds 10.5 hours in a day. Spread time is the total amount of time from when the operator first pulls out the vehicle during the first run of the day and when the operator pulls in the vehicle at the conclusion of the last run of the day. The operators receive a premium equal to half their rate of pay for elapsed time greater than 10.5 hours in a day. Additionally, "extra board" operators receive a premium payment equal to their hourly rate (essentially double time) for all hours in excess of eleven hours worked. These premium payments are on top of the daily and weekly overtime payments provided to operators and these premium payments are made regardless of whether the operator worked more or less than 40 hours in a week. (Quail Decl. ¶ 4(d); Cuff Decl. ¶¶15-18; CBA 75.)

> Daily Overtime—SCVTA provides bus operators overtime whenever they work more than eight hours in a day. This is in addition to the FLSA requirement that operators be paid for hours worked in excess of 40 in a workweek. (Evans Decl. ¶ 6; CBA 72.)

> Allowed Time—SCVTA provides bus operators "allowed time" which provides compensation for eight hours of work, even when an operator works fewer than eight hours in a day. For example, an operator whose shift only requires 7 hours and 35 minutes of work, would receive 25 minutes of allowed time. (Quail Decl. ¶ 4(a).)

## C.   Travel Time

As noted above, two types of travel time are central to Plaintiffs' claims. The first type of travel time at issue is start-end travel time where an operator's shift begins or ends away from the operator's home yard. (*See* First Amended Complaint (Dkt. 27 at 4:12-22).) In such situations, VTA pays the operators for the amount of time it would take to ride either public transit or VTA provided transportation to or from the yard. (Cuff Decl. ¶ 11.) The second is split-shift travel time, where an operator ends her first run of the day at one geographic location and then starts the next run in the split from a different location. In such situations, the VTA pays the drivers for the amount of scheduled time it takes to ride VTA-provided transportation between the two geographically diverse locations. (Cuff Decl. ¶ 13.)

---

[3] In addition to the compensation detailed in the run synopses, all operators are provided a form they can use to request overtime payments in situations where they work additional time beyond the time detailed in the run synopses. (Evans Decl. ¶ 8.)

-6-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1

### 1.    Start-End Travel

2      Some runs begin and end at the operators' division yard. (Cuff Decl. ¶ 9.) Other runs start in

3    the yard and end at a relief point in the field, or vice versa. (Cuff Decl. ¶ 9.) And other runs both

4    start and end at a relief point in the field. (Cuff Decl. ¶ 9.) Operators are free to travel to start or end

5    points in the field using any method of transportation they like. (Cuff Decl. ¶ 9.) They are not

6    required to stop in the division yard before starting a run in the field or after ending a run in the

7    field. (Cuff Decl. ¶ 9.)

8      In situations where a run starts or ends in the field, operators receive a negotiated benefit

9    under their CBA. The benefit is a penalty payment, which is based on the time for a VTA bus or

10   light rail vehicle to travel between the operator's home division and the starting/ending point in the

11   field. (Cuff. Decl. ¶ 11.) This benefit is provided even though there is no requirement to travel

12   between the yard and the relief point and, as explained below, is provided even when the operators

13   do not engage in such travel. (Cuff. Decl. ¶ 11). It is simply a negotiated benefit that operators

14   receive for working particular runs.

15     The operators are familiar with this above arrangement. SCVTA instructs the operators at

16   training that they are not required to report to the yard before starting a shift that begins at a relief

17   point or after a shift that ends at a relief point (Spellberg Decl. Ex. K, Williams Depo. 58:13-18

18   (reporting that operators learn in training that they can travel directly home from the relief point

19   without returning to yard).) Operators need only report to the starting point of their shift on time.

20   (Cuff Decl. ¶ 11.) And once they are done with their shift, operators are free to go home, visit

21   friends and family, go to a movie, or do whatever they like without any obligation to return to the

22   yard or to the starting point of the run. (Cuff Decl. ¶ 11.) Indeed, none of the Plaintiffs disputed this

23   fact and almost all of the Plaintiffs reported that there were situations where they did not travel back

24   to the yard after ending a shift. (Spellberg Decl. Ex. D, Estorga Depo. 23:14-24:7, 29:8-25, 36:5-9,

25   52:1-24; Ex. C, Edwards Depo. 25:7-10, 25:24-26:7; Ex. A, Butler Depo. 24:13-17, 25:4-12, 29:20-

26   30:9; Ex. E, Gorman Depo. 32:22-33:25; Ex. H, Silva Depo. 46:14-19; Ex. I, Solis Depo. 22:19-

27   23:6; Ex. J, Thomas Depo. 29:5-25.) They also reported situations where they would travel directly

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

from home to a starting point away from the yard. (Williams Depo. 36:12-18 (would walk to relief point where her run started because it was close to her house).)

Bus operators at VTA employ a variety of tools and methods in traveling directly between their homes and the start or end point of a run. For example, each division's yard features a "Key Board" – a board consisting of labels and hooks on which keys can be hung. Operators assigned to a route that finishes away from the yard have the option of putting their keys on the Key Board. The relieving bus operators will check the board in the morning to see whether the driver that they are relieving has left her keys on the Key Board. If the driver has left her keys, then the relieving driver can then take those keys and drive the first operator's vehicle to the relief point. This allows the operator being relieved to drive her car directly home from the relief point without returning to the yard. Nine of the eleven Plaintiffs deposed reported using the Key Board system to transport their own or another's car to or from the relief point. (Estorga Depo. 82:3-83:4 (would check keyboard daily); Edwards Depo. 22:5-19; Thomas Depo. 17:8-10; Butler Depo. 23:6-12; Silva Depo. 39:13-15; Solis Depo. 21:5-22:14; Williams Depo. 43:9-13; Spellberg Decl. Ex. B, Diaz Depo. 36:9-14.)[4]

Many drivers also use alternatives to the Key Board system and directly arrange with their relief driver to bring their automobile to the end point. (Butler Depo. 24:3-12; Gorman Depo. 33:1-25). Operators are notified during training of the ability to join smartphone messaging groups, which the drivers use to arrange for relief in the field. (Thomas Depo. 59:18-21.) Many of the Plaintiffs reported using these messaging applications (operators at one division use WhatsApp and operators at another division use GroupMe) to coordinate the drop-off of operators' vehicles at relief points. (Butler Depo. 28:6-29:5 (reporting that the GroupMe app was "effective" and he would use it almost daily to arrange for a relief driver to bring his car to his end point); Silva Depo. 65:9-67:4 (typically uses WhatsApp to coordinate relief in the field); Thomas Depo. 59:18-60:23 (would check WhatsApp every day to arrange relief).)

For many of the operators, starting or ending at a relief point is more convenient because the

---

[4] Curiously, Plaintiff George Lopez reported that he had never used the Key Board system, (Spellberg Decl. Ex. G, Lopez Depo. 24:11-25) but Plaintiff Rodney Thomas reported doing Key Board relief with Lopez (Thomas Depo. 55:2-5).

RENNE PUBLIC LAW GROUP
Attorneys at Law

relief point is closer to their home. This allows the operators to travel directly between their home and the start or end point without first traveling to the yard. For example, Plaintiff Estorga reported that he bid on a run that ended in Gilroy close to his home. (Estorga Depo. 22:19-24:1; 27:5-8.) Estorga would leave his personal vehicle at the end point, so he could drive directly home at the end of the run without returning to the yard. (Estorga Depo. 23:14-24:7.) Leaving a personal vehicle at the end relief point of the shift was reported as a common practice among the drivers. (*See* Thomas Depo. 29:12-25 (reporting that he and a lot of other operators will leave their personal vehicles at the end point so they can drive directly home at the end of the day).)

Other operators would simply walk from home to the relief location (Silva Depo. 63:12-17 (describing employees walking from home to relief point); Williams Depo. 36:12-18 (would sometimes walk to and from relief points close to her house). And some reported bringing their bicycle on the bus and then just commuting home on the bicycle after finishing the shift at a relief point. (Williams Depo. 27:4-19; Spellberg Decl. Ex. F, Kemp Depo. 54:4-8 (purchased a folding bike to bring with her on the bus); Silva Depo. 68:17-69:2 (would sometimes ride a bicycle to get to the relief point).) Other operators would use public transportation. (Butler Depo. 29:20-30:9).

In all of these scenarios, the Plaintiffs were provided a travel time payment for the agreed-upon travel time between the yard and the relief point, even though the operators chose to travel directly between the relief point and their home.

### 2.    Split-Shift Travel

Split-shift travel occurs when an operator is assigned to a split shift where the second run of the shift starts in a location different from where the first run ends. In most cases, the break in between the two runs is long – more than an hour and up to four hours – and in all cases the operators are completely relieved from their duties during this time and do not need to return to the yard. (Cuff Decl. ¶ 13; Edwards Depo. 15:14-20; Butler Depo. 47:25-48:2). Plaintiffs reported using this time for running errands, exercising, relaxing, and performing a variety of other personal activities. (*See, e.g.*, Kemp Depo. 41:13-18 (reporting that she used split time for "[b]anking, get[ing] a haircut, get[ting] a manicure/pedicure, shopping); Solis Depo. 31:15-32:7 (used split

RENNE PUBLIC LAW GROUP
Attorneys at Law

break to "take a nap, I would eat lunch, and then just stick around the yard and watch TV . . . Occasionally I ran errands. During that time it became almost Holiday shopping, so I would go to the store real quick to see if I could buy anything. Christmas gifts and things like that."); Silva Depo. 38:5-21 (reporting that he would "usually go home and play basketball," that he tried to stay active or run errands during the split, and that he felt that "a split like that is like a day off. You've got to get things done."); Butler Depo. 46:21-47:8 (reporting using split time to run personal errands); Edwards Depo. 34:19-35:14 (would use split time to relax, eat lunch, sometimes run errands). Plaintiff Silva reported that he often preferred a longer split break because it allowed him to take care of his errands, nap, or exercise. (Silva Depo. 91:5-21.)

In situations where the operator's next run starts at a location different from where the prior run ends, the CBA provides the operator with additional pay for the time it takes to travel between the two locations on SCVTA transportation, paid at straight time. (CBA 75-76; Cuff Decl. ¶ 13.) This pay, referred to as "split-shift travel time," is paid regardless of how the operators choose to get to the starting point of their next location. (Cuff Decl. ¶ 14.) And indeed, since the operators often spend their split time relaxing or recreating at various locations, they frequently travel to the starting point of their next shift via various means – *e.g.*, in an automobile, by walking, or any other form that is convenient for the operator. (*See* Solis Depo. 26:18-22; *see also* Williams Depo. 36:12-18 (would walk home after her first run of the day and then drive her car for the second run of the day).

### D.     *Rai* Litigation

Several VTA operators covered under the same CBA as Plaintiffs previously filed a lawsuit entitled *Rai v. Santa Clara Valley Transportation Authority*, Case No. 5:12-vc-04344-PSG (N.D. Cal, filed Aug. 17, 2012), alleging VTA did not pay them overtime owed under the FLSA. Unlike this case, *Rai* was a hybrid rule 23 class action/FLSA collective action and all bus operators became party to the lawsuit unless they affirmatively opted out. (Spellberg Decl. ¶ 4.) The *Rai* plaintiffs' claims included the two claims at issue here:  unpaid overtime premiums for start-end travel time

RENNE PUBLIC LAW GROUP
Attorneys at Law

and for split-shift travel time.[5]

The *Rai* lawsuit was resolved through a judicially approved settlement agreement. (Spellberg Decl. ¶ 4, Ex. L ("Settlement").) Because an employee cannot waive claims under the FLSA, they may not be settled without supervision of either the Secretary of Labor or a district court. *See Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981); *Beidleman v. City of Modesto*, No. 1:16-cv-01100-DAD-SKO, 2018 WL 1305713, at *1 (E.D. Cal. Mar. 13, 2018); *Yue Zhou v. Wang's Rest.*, No. 05-cv-0279 PVT, 2007 WL 2298046, at *1 n.1 (N.D. Cal. Aug. 8, 2007). The Court ultimately issued a judgment (Spellberg Decl. Ex. N), approving the settlement which resolved the start-end travel time issue as follows:

> Plaintiffs claimed that VTA failed to properly compensate Operators for the time spent travelling between geographically different start and end points (known as "Start End Travel Time"). VTA produced substantial evidence that this travel time was covered by the Portal-to-Portal Act and is therefore not compensable under the FLSA . . . .

(Settlement § 6.3.7.) VTA agreed that it would instruct operators that they are not required to take public transit or VTA shuttles to travel to a relief point at the beginning of a shift or from a relief point at the end of a shift. (Settlement § 6.3.7.) Plaintiffs acknowledged receiving this instruction in training. (Silva Depo. 88:2-24; Williams Depo. 58:13-16; Butler Depo. 26:5-14.)

Similarly, on split-shift travel time, the Agreement provides,

> Plaintiffs claimed that VTA failed to properly compensate Operators who work split shifts for the time to travel from the end of the first run to the start of the second run, where those points are geographically distinct (known as "Split Shift Travel Time"). VTA produced substantial evidence that VTA pays Operators for Split-Shift Travel Time for the "running time" of a VTA bus or light rail vehicle, and pays numerous premiums, including but not limited to Elapsed Time, Allowed Time, Guaranteed time, Short Rest Premium, Holiday Worked Pay, Birthday Pay and others, which are not required by federal or state law and that equal or exceed the amounts VTA would potentially pay based on Plaintiffs' claims for additional Split-Shift Travel Time compensation. VTA also produced substantial evidence that Operators are not required to take public transit to perform spit-shift travel, and in fact perform split-shift travel by using automobiles and VTA-provided shuttles, and walking on foot, in addition to taking public transit.

(Settlement § 6.3.8.) Again, VTA agreed that it would instruct operators that they are not required

---

[5] *Rai* also involved several claims that are not at issue in this lawsuit. Those claims are not discussed in this brief.

RENNE PUBLIC LAW GROUP
Attorneys at Law

to take public transit or VTA shuttles for split-shift travel and that the operators are free to attend to personal business during the split time. (Settlement § 6.3.8.) Plaintiffs acknowledged receiving this instruction in training. (Silva Depo. 89:22-90:2; Williams Depo. 58:2-10.)

### E.   Claims Brought by Robert Estorga

Plaintiff Estorga opted out of the *Rai* lawsuit. (Dkt. 45 at 2.) While the *Rai* lawsuit was ongoing, Estorga brought a grievance alleging that he was entitled to additional compensation under the CBA. (Ahn Decl. ¶ 3.) Estorga then filed this lawsuit as an FLSA collective action.

## IV.   STANDARD OF REVIEW

SCVTA seeks summary judgment or partial summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure. Summary judgment or partial summary judgment is properly granted when no genuine and disputed issues of material fact remain and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. FRCP Rule 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 106 S. Ct. 2548 (1986); *Eisenberg v. Ins. Co. of N. Am.,* 815 F.2d 1285, 1288-89 (9th Cir. 1987).

## V.   ARGUMENT

It is undisputed that SCVTA provides bus operators with payments equivalent to the operators' straight time wages for all scheduled travel time, including the start-end travel and split-shift travel at issue in this case. (*See* Dkt. 27 at 4 ¶ VIII.) The dispositive issue is whether these payments constitute compensation for hours worked, thereby entitling plaintiffs to an additional half-time premium payment for those hours when they exceed forty in a week. They do not.

### A.   Start-End Travel Time

#### 1.   Start-End Travel Time Does Not Constitute Hours Worked

Plaintiffs are not entitled to FLSA overtime for their start-end travel because such time constitutes classic work-to-home commute time, which has never been compensable under the FLSA.

Under the FLSA, employers need only pay employees overtime for all hours actually worked in excess of 40 in a workweek. *See* 29 U.S.C. § 207. Employment is defined under the Act

RENNE PUBLIC LAW GROUP
Attorneys at Law

-12-

to include all hours that an employee is "suffer[ed] or permit[ed] to work" for an employer. 29 U.S.C. § 203(g). "The general rule, however, is and always has been that the FLSA does not treat ordinary home-to-job site travel as compensable." *Kuebel v. Black & Decker, Inc.,* 643 F.3d 352, 360 (2d Cir. 2011); *see Pietrzycki*, 290 F. Supp.3d at 834-835 (citing multiple cases predating the Portal-to-Portal Act holding home-to-work travel non-compensable). Moreover, Congress has passed the Portal Act clarifying that employers need not compensate employees for "walking, riding or traveling to and from the actual place of performance of the principal activity" the employee is employed to perform or for "activities which are preliminary to or postliminary to said principle activities . . . ." 29 U.S.C. §254(a)(1)-(2).

Both the U.S. Supreme Court and the Ninth Circuit have squarely held that time spent travelling to or from the place where an employee performs their principal job duties is non-compensable under the FLSA. *Integrity Staffing Solutions, Inc. v. Busk*, _ U.S. __, 135 S. Ct. 513, 516-17 (2014) (time spent by employees waiting for and undergoing security screenings before leaving work was not compensable under the FLSA); *Balestrieri v. Menlo Park Fire Prot. Dist*., 800 F.3d 1094, 1101 (9th Cir. Sep. 4, 2015) (applying *Integrity Staffing* to hold time spent transporting equipment to and from their home fire station to work assignments at other fire stations not compensable because it was not "integral and indispensable" to the firefighters' "principal activity"); *see also Rutti v. Lojack Corp*., 596 F.3d 1046, 1061 (9th Cir. 2010) (time spent traveling in employer-provided vehicle to first job site of day and from last job site of day, which varied daily, was non-compensable travel time); *Imada v. City of Hercules*, 138 F.3d 1294, 1296 (9th Cir. 1998) ("Ordinary home to work travel is not compensable under the FLSA, regardless of whether or not the employee works at a fixed location").

Multiple courts have specifically addressed the question of whether transit operators' start-end travel time constitutes hours worked under the FLSA. The courts are nearly unanimous in holding that start-end travel time, such as that provided by SCVTA to the Plaintiffs here, is non-compensable time under the FLSA. *See United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109 (10th Cir. 1999) (time spent travelling on employer-provided shuttles to and from

Renne Public Law Group
Attorneys at Law

-13-

first or last or only shift of day "is classic commuting-to-work time, excluded from compensation by the Portal-to-Portal Act"); *Local 589, Amalgamated Transit Union v. Massachusetts Bay Transportation Authority (MBTA)*, 94 F.Supp.3d 47 (D. Mass. 2015) (start-end travel time not compensable hours worked because it was not part of operators' principal activity); *Margulies v. Tri-County Metropolitan Transp. Dist. of Oregon*, No. 3:13-cv-00475-PK, 2015 WL 4066654 (D. Ore. July 2, 2015) (unreported) (start-end travel time non-compensable under FLSA because it was distinct from transit operator's principal activity). The sole case to find start-end travel time compensable was *Gilmer v. Alameda-Contra Costa Transit Dist.*, No. C08-05186-CW, 2010 WL 289299 (N.D. Cal. Jan. 15, 2010) (unreported). As explained below, however, that case used a test rejected by the U.S. Supreme Court and, in any event, is readily distinguishable from this case. *See infra* Section V(A)(2).

 *Albuquerque*, the sole federal appellate case to address the start-end travel time issue, is instructive. In *Albuquerque*, bus operators sought compensation under the FLSA for time spent shuttling between geographically different start and end points. The Tenth Circuit Court of Appeals found that such travel is "classic commuting-to-work time." *Albuquerque*, 178 F.3d at 1120-21. As explained by the Court, Albuquerque's bus operators, like the bus operator Plaintiffs here, are "obligated only to appear on time at the particular place from which their first bus runs begin, whether that is the City garage or some relief point. At the end of the day, following their last bus run, they may go home any way they choose, by any means they choose." *Id.*at 1120. The court explained, "the fact that a driver may end his workday at a relief point, where his own vehicle is unavailable, does not transform what would otherwise be a simple work-to-home commute into compensable hours worked." *Id.* at 1121.

 The *Albuquerque* court further found "[t]he fact that some employees might choose to use a city shuttle to go to or from the city garage, as part of their commute at the beginning or end of their workday, did not transform that time into hours worked under the FLSA." *Id.* at 1120 (citing *Baker v. GTE North Inc.*, 110 F.3d 28, 30-31 (7th Cir. 1997 and *Vega v. Gasper*, 36 F.3d 417, 425 (5th Cir. 1994) (farm workers travelling to and from fields on employer's bus for four hours not

RENNE PUBLIC LAW GROUP
Attorneys at Law

compensable)); *see also Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1343 (11th Cir. 2007) (preliminary activity of travel on employer vehicles through security screening to work place not compensable).

Like the operators in *Albuquerque*, it is undisputed that SCVTA operators are free to travel to and from their start and end points as they like; they need not take SCVTA-provided transportation and need not report to the division yard. (Cuff Decl. ¶ 10; Solis Depo. 65:21-66:4.) And in fact, as discussed at length above, many of the plaintiffs testified that they typically used alternate means to travel home and that using SCVTA-provided transportation was the exception rather than the norm. *See supra* Section III(C)(1).

### 2. *Gilmer* is an Outlier Decision Which Was Wrongly Decided and is In Any Event Easily Distinguishable

#### a. *Gilmer* was Wrongly Decided

As explained above, courts have uniformly held that start-end travel does not constitute compensable work hours under the FLSA. The sole contrary case is the unpublished case of *Gilmer*, 2010 WL 289299. *Gilmer* has been criticized as being "rooted in the outlier idea that employees are not engaged in their ordinary home-to-work-travel when their circumstances require them to travel in a way that is not effectively voluntary and does not directly benefit themselves." *MBTA*, 94 F.Supp.3d at 53-54. Indeed, following *Gilmer*, the U.S. Supreme Court rejected that very premise. *Integrity Staffing Solution, Inc., v. Busk*, 135 S. Ct. 513 (2014).

Crucially, *Gilmer* recognized that regular commute time between home and work never counts as compensable work time under the FLSA, because "[o]rdinary travel time from home to work, even prior to the enactment of the Portal Act, was not considered hours worked." *Id.* at *5 (citing *Anderson v. Mt. Clemons Pottery Co.*, 328 U.S. 680, 691 (1946)). However, *Gilmer* improperly determined that the start-end travel time in that case did not constitute home-to-work travel because the decision whether to use the employer-provided shuttles was not voluntary. *Gilmer*, 2010 WL 289299 at *6 (finding that the start-end travel arrangement did "not concern optional shuttle buses to work sites.") The Court determined that the employer arranged the end

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    points of the run for its own convenience and that the decision whether to use employer-provided

2    transportation was not truly voluntary because the evidence only showed that there "may be 'some

3    instances' where drivers finish at a location from which they can easily return home without first

4    returning to the starting point," but that absent "fortuitous circumstances," the employees had to

5    spend time returning to their starting point to begin their commute home. *Id*. at *5-6. Accordingly,

6    *Gilmer* held that the start-end travel was not regular commute time because it was mandatory.

7         *Gilmer*'s premise was subsequently overruled by the U.S. Supreme Court. In *Integrity

8    Staffing*, the Court has held that the question of whether an activity is voluntary or mandatory is an

9    improper test for determining whether an activity constitutes non-compensable preliminary or

10   postliminary activity under the FLSA. 135 S. Ct. at 518-519. *Integrity Staffing* reversed a Ninth

11   Circuit decision that held time spent by warehouse workers waiting to undergo security screening

12   before leaving the premises constituted hours worked because it was done for the benefit of the

13   employer and therefore a component of the employees' principal activity. *Integrity Staffing*, 135 S.

14   Ct. at 516. The Supreme Court held, "The Court of Appeals erred by focusing on whether an

15   employer *required* a particular activity." *Id*. at 519. The Court explained that the proper test of

16   whether a preliminary or postliminary activity is compensable under the FLSA is whether "it is an

17   intrinsic element of those activities and one with which the employee cannot dispense if he is to

18   perform his principal activities." *Id*. at 519; *see also Balistrieri,* 800 F.3d at 1101 ("Even activities

19   required by the employer and for the employer's benefit are 'preliminary' or 'postliminary' if not

20   integral and indispensable to 'the productive work that the employee is *employed to perform*.'")

21   (emphasis in original); *MBTA*, 94 F.Supp.3d at 53-54 (rejecting *Gilmer* and holding start-end time

22   not compensable because it occurs after the completion of the MBTA employees' principal

23   activity).

24        Numerous courts have adopted similar reasoning to hold that employees were engaged in

25   non-compensable commute time even when they were required to travel to the start point in certain

26   ways. *E.g., Griffin v. S & B Engineers & Constructors*, Ltd., 507 F. App'x 377, 378 (5th Cir. 2013)

27   (Rejecting voluntariness as a relevant factor for identifying commute time and holding time spent

28

-16-

RENNE PUBLIC LAW GROUP
Attorneys at Law

traveling to factory using mandatory park-and-ride arrangement qualified as non-compensable commute time); *Bonilla*, 487 F.3d at 1343 (fact that employer required employees to use mandatory employer-provided bussing system irrelevant to determine whether such time was compensable under FLSA).

Against the clear weight of this extensive legal authority, *Gilmer*'s reasoning cannot stand.

### b.   *Gilmer* is Easily Distinguishable

#### i.   Plaintiffs Are Not Required to Use SCVTA Transport for Their Commute, Nor are They Required to Travel to Their Home Yard Before or After a Shift

Even if the Court finds *Gilmer*'s reasoning persuasive – and it should not – the facts presented here are readily distinguishable. In stark contrast to *Gilmer*, the record here demonstrates that use of SCVTA-provided transportation is not mandatory – and routinely is not used. The overwhelming evidence from plaintiffs' deposition testimony demonstrates that the operators frequently forego using SCVTA transportation to travel to or from a relief point and frequently travel directly between their homes and the relief point. *See supra* Section III(C)(1).

A variety of different systems enable the bus operators to freely travel to and from the starting and ending points of their shifts using personal transportation. As explained in detail above, nearly all of the operators used the "Key Board" system they learned about in SCVTA training to arrange for relief drivers to bring their vehicles directly to the relief point. *See supra* Section III(C)(1). Many of the drivers also used the WhatsApp or Group Me messaging apps to arrange for the drop off of their vehicle. *Id.* Several operators left their vehicles at the relief point and other operators would take public transit, walk, or ride their bike directly between their homes and the work site. *Id.*

The Plaintiffs' deposition testimony evidence clearly demonstrates that, unlike *Gilmer*, the decision whether to use employer-provided transportation to travel to or from a starting point is truly optional here and is not in any way mandatory, as it was in *Gilmer*. Here, the bus operators did not simply travel home when "fortuitous circumstances" arose, but instead selected convenient runs and then made alternative travel arrangements through the Key Board system and the WhatsApp

-17-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    and GroupMe messaging systems. The evidence presented here demonstrates that there was a true

2    and genuine choice whether to travel between the operators' homes and the relief points where they

3    start and/or end their shifts and that the vast majority of operators take advantage of the option to

4    travel directly home without returning to the yard. Under *Gilmer*'s own reasoning, these facts

5    demonstrate that the start-end travel time was simply part of the operator's work-to-home commute

6    time.

7                    ii.    **Unlike *Gilmer*, the Parties' CBA Does Not Treat Travel Time as Compensable**

8            *Gilmer* is inapplicable for another reason. Unlike this case, *Gilmer* found that explicit

9    language in that collective bargaining agreement had made start-end travel time "compensable"

10   under Section 254(b). *Gilmer*, 2010 WL 289299 at *5. In *Gilmer* the Court found that the "the CBA

11   provides that pay for start-end travel time 'shall be computed on the scheduled running time of the

12   services then available,' and, accordingly, must be counted as hours worked when calculating the

13   plaintiffs' overtime rate." *Gilmer*, 2010 WL 289299 at *5. In contrast, here the parties' CBA does

14   not consider travel time hours worked, but rather a negotiated "penalty" for potential operator

15   inconvenience. (Cuff Decl. ¶ 10.) The CBA makes clear that travel time penalty payments do not

16   constitute hours worked. (CBA 75-76.) The fact that the travel time is a penalty and not actually

17   compensation for time worked is underscored by the fact that travel time is always paid to the

18   operators, even when they choose to forego traveling between the yard and the relief point. *See*

19   *supra* Section III(C).

20           Payments like the travel time penalties here, made under a CBA in acknowledgement of

21   operator inconvenience, are not the same as "compensable" time. For example, the *Margulies* court

22   rejected contentions that CBA negotiated payments for "road relief" (paid when an assignment ends

23   at a location different from its starting point) constituted compensable time under the FLSA.

24   *Margulies,* 2015 WL 4066654 at *11. And in *Albuquerque*, the court rejected the contention that

25   city payment of a "split shift differential" constituted an acknowledgment "that the split shift period

26   is compensable." 178 F.3d at 1118 n.11. Similarly, here, the fact that VTA paid operators a

27   "penalty" for "less convenient" runs – those that begin or end away from the operator's home yard –

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

-18-

1   does not make that time "compensable" under the FLSA.

2                                    *        *        *

3        For each of these reasons, this case can be distinguished from the outlier holding of *Gilmer*.

4   This Court should adopt the majority view and grant Defendant summary judgment on this issue

5   and find that start-end travel time does not constitute hours worked and is therefore non-

6   compensable. Alternatively, at a minimum the Court should grant partial summary judgment to

7   Defendant on this issue and find that start-end travel time does not constitute hours worked on the

8   days the operators did not use VTA-provided transportation to travel between the yard and the relief

9   point.

10       **B.      Plaintiffs Are Not Entitled to Additional Compensation for Split-Shift Travel**
            **Time Because Such Time is Non-Compensable Under The FLSA**

11

12       Split-shift travel time is not compensable under the FLSA. Some courts have ruled that

13  periods between shifts are non-compensable, because the employee is "completely relieved of

14  duty," but that travel time between split shift locations is compensable. *See Albuquerque*, 178 F.3d

15  at 1117-20; *see also Margulies*, 2015 WL 4066654, at *13-14. But under *Integrity Staffing*, decided

16  after *Albuquerque*, this time is properly characterized as commute time because it is not "integral

17  and indispensable" to the "principal activity" of operating a bus or light rail vehicle. *Integrity*

18  *Staffing*, 135 S. Ct. at 520.

19       Significantly, there is no basis to conclude that *all activity* within a single 24-hour period

20  must be considered one "work day." A recent decision by Judge Posner supports this fact: "Workers

21  given a half-hour lunch or other meal break from work are in effect working two four-hour

22  workdays in an eight-and-a-half-hour period." *Mitchell v. JCG Industries, Inc.*, 745 F.3d 837 at 839

23  (7th Cir. 2014) (activities that were not compensable at the start and end of the continuous workday

24  were similarly non-compensable when completed at either end of the meal break, which broke the

25  day into two separate workdays). Department of Labor regulations also support this interpretation.

26  *See* 29 C.F.R. § 785.16(b) (example of truck driver sent from Washington D.C. to New York City,

27  leaving at 6 a.m. and arriving at 12 noon, and relieved from all duty until 6 p.m., when he begins the

28

                                          -19-

return trip; the "idle time is not working time").[6]

Here, the evidence overwhelming demonstrates that the long breaks during split shift, often spanning four hours, completely relieve the employees from work. *See supra* Section III(C)(2) (describing the various personal activities operators engage in during split-shift breaks, including banking, visiting salons, shopping, napping, exercising, watching television, playing basketball, and running errands). And indeed, some operators reported going home during the break, (Silva Depo. 38:5-21(would go home and play basketball during split shifts); Williams Depo. 36:9-18 (reporting that for certain runs she would walk home after her first shift of the day and then drive to the yard for her second run of the day).)

There is therefore no basis to conclude that the commute time during these breaks should be treated any differently from the operators' commute time at the beginning or end of the day.

## C. SCVTA is Entitled to Use Elapsed Time and Other Premium Payments to Offset any FLSA Overtime Liability

Even if this Court holds that any travel time is compensable, Plaintiffs are not entitled to any additional compensation because SCVTA compensates the employees more generously than the requirements of the FLSA.

Under the FLSA, certain extra compensation provided to employees for work, which is not otherwise required by the FLSA, may be credited against any overtime premiums owed under the FLSA. 29 U.S.C. § 207(h). These offsets include: premium payments in excess of a daily or weekly standard, *id.* § 207(e)(5); premium payments for working on certain days, *id.* § 207(e)(6); and premium payments for working certain hours as defined in a collective bargaining agreement *id.* § 207(e)(7). *See* 29 U.S.C. § 207(h).

SCVTA is entitled to a credit for the elapsed time premium payments it provides the operators. As explained above, for each split-shift assignment, SCVTA measures spread time – the

---

[6] An employee is off duty while waiting to be engaged, where "completely relieved from duty" and where the time period is "long enough to enable him to use the time effectively for his own purposes." 29 C.F.R. § 785.16(a). By contrast, an employee is on duty while engaged to wait, where "waiting is an integral part of the job." 29 C.F.R. § 785.15.

RENNE PUBLIC LAW GROUP
Attorneys at Law

1   amount of time from when the driver first pulls out in the morning until the driver pulls in the

2   evening. (Cuff Decl. ¶ 15.) The CBA provides that operators will be paid an additional half-time

3   premium – on top of the overtime premium – for all spread time hours in excess of 10.5 hours.

4   (CBA 75.) Additionally, SCVTA provides the extra board operators with spread time greater than

5   11 hours with a premium payment equal to the full value of their hourly pay. (Cuff Decl. ¶ 15.) The

6   operators receive these elapsed time premiums in addition to the time-and-a-half overtime

7   payments; for this reason many of the operators refer to these runs as "double frags" because of the

8   perceived double overtime associated with the runs. (Butler Depo. 45:15-45:25.)

9          SCVTA is entitled to use the elapsed time premium payments to offset any overtime liability

10   because they constitute premiums for work "in excess of the employee's normal working hours or

11   regular working hours," under 29 U.S.C. section 207(e)(5) and also a premium "for work outside of

12   the hours established in good faith by the contract or collective bargaining agreement" under

13   29 U.S.C. section 207(e)(7). Take for example the weekday split-shift assignment operated by

14   Plaintiff Silva during the first quarter of 2016. (Cuff Decl. ¶ 18, Ex. C.) The first run of the split

15   starts at 6:00 a.m., starting at division, and ends at 8:46 a.m. back at division. (*Id.*) The operator is

16   then free for over four hours. The second run of the split starts at a relief point in the field at

17   1:04 p.m. and ends at 6:25 p.m. back at division. (*Id.*) During her long break, the operator is

18   provided 16 minutes of travel time to travel between the end point of the first run and the start point

19   of the second run. (*Id.*) The plaintiffs concede that the 16 minutes is paid at the Plaintiff's straight

20   time rate. Under Plaintiffs' theory, Silva would be entitled to an additional halftime premium for

21   this 16 minutes of travel time – *i.e.*, an additional eight minutes. However, that run resulted in an

22   elapsed time premium payment of 58 minutes of additional compensation because the spread time

23   was 12:25 (the span of time from 6:00 a.m. until 6:25 p.m.). This is 115 minutes beyond the 10.5

24   hour threshold and half of 115 rounded up to the nearest minute is 58. This 58-minute elapsed time

25   premium may be used to offset travel time owed for that day or any other day during the applicable

26   pay period. *Id.*; *see Haro v. City of Los Angeles*, 745 F.3d 1249 (9th Cir. 2014) (overtime premium

27   payments may be used to offset any overtime during applicable pay period). This 58-minute

28

SCVTA'S NOM AND MOT FOR SUMMARY JUDGMENT OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT, MPA – CASE NO. 5:16-CV-02668-BLF

RENNE PUBLIC LAW GROUP
Attorneys at Law

premium pay more than covers the four additional minutes of time that Plaintiffs claim that operator Silva is due on this run.

SCVTA is also entitled to offset its FLSA overtime liability with its weekly overtime payments, which are more generous than those required under the FLSA. Under 29 U.S.C. section 207(h) SCVTA may offset its FLSA overtime liability with "premium rate[s] paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of eight in a day or in excess of the maximum workweek." 29 U.S.C. § 207(e)(5). Under the CBA, SCVTA provides employees with overtime payments at time-and-a-half the operator's regular rate for all hours worked in excess of eight in a day or forty in a week. (CBA 114). These payments are more generous than those required under the FLSA for multiple reasons. First, SCVTA pays drivers daily overtime for work in excess of eight hours, even though such payments are not required under the FLSA. (*Id.*)[7]  SCVTA also counts sick time as hours worked for purposes of calculating weekly overtime, even though sick time does not count as hours worked under the FLSA. (CBA 86.)[8] These payments each have the effect of increasing the weekly overtime premiums paid by SCVTA beyond what is required under the FLSA and, accordingly, may be used to offset liability under 29 U.S.C. section 207(e)(5).

SCVTA also provides operators with holiday pay equivalent to 2.5 times the operators' normal pay. (Quail Decl. ¶ 4(e); CBA 19.) This pay constitutes "extra compensation provided by a

---

[7] For example, imagine an operator who works 10 hours during her first shift of the workweek. Under the CBA's daily overtime guarantee, she will be paid for 11 hours of work (8 hours at straight time and 2 hours at time-and-a-half) even if she takes the rest of the week off as vacation. However, under the FLSA, she is only entitled to 10 hours of pay since she worked fewer than 40 hours in the week. SCVTA may use the additional one hour of compensation paid under the CBA as a credit against any additional overtime owed in that work period. *E.g.*, *Connor v. Celanese, Ltd.*, 428 F. Supp. 2d 628, 636 (S.D. Tex. 2006) ("where an employee receives premium pay for each day she works over eight hours, that pay is credited toward the overtime pay requirements of Section 207(a)").

[8] For example, imagine an operator who works eight-hour days her first four shifts of the week. She takes eight hours of sick leave on her fifth day of work, but then picks up an extra eight-hour shift on the last day of the workweek. Under the CBA, she would be compensated for 52 hours of work (40 hours at straight time and 8 hours at time-and-a-half). Under the FLSA she is only entitled to 48 hours of pay because the 8 hours of sick leave do not count as hours worked. SCVTA is therefore entitled to use the additional 4 hours of overtime premiums paid to the operator as a credit against any additional overtime owed.

RENNE PUBLIC LAW GROUP
Attorneys at Law

1   premium rate paid for work by the employee on Saturdays, Sundays, holidays, or regular days of

2   rest." 29 U.S.C. § 207(e)(6). SCVTA may therefore use these payments to offset any overtime owed

3   to Plaintiffs. 29 U.S.C. § 207(h)(2); *see also Alexander v. United States*, 32 F.3d 1571, 1577 (Fed.

4   Cir. 1994) (Sunday and Holiday premium payments may be used to offset FLSA overtime liability).

5       Accordingly, Defendant is entitled to a partial summary judgment order finding that it may

6   use the above premium payments to offset any FLSA overtime liability.

7       **D.   SCVTA Acted in Good Faith and There is No Basis for a Finding that it Acted
         Willfully or Recklessly**

8

9       At all times SCVTA has acted in good faith and there is no evidence supporting a finding

10  that SCVTA acted willfully to violate the FLSA. Significantly, SCVTA complied with the terms of

11  the final order and judgment in the *Rai* case, which held that SCVTA's conduct with respect to

12  start-end and split-shift travel time was consistent with the FLSA.[9]

13          **1.   SCVTA's Good Faith Defense**

14      Employers found to have violated the FLSA will ordinarily pay "liquidated damages" as part

15  of the remedy. 29 U.S.C. § 216(b). Liquidated damages are usually equivalent to the amount of

16  actual back pay (thus the back pay is essentially doubled). However, if an employer can show that it

17  acted in "good faith," the court may award no liquidated damages, or a lesser amount. 29 U.S.C.

18  § 260.

19      "Good faith" is defined as "honesty of intentions . . . no knowledge of circumstances which

20  ought to put him upon inquiry." 29 C.F.R. § 790.15. The key question is whether the employer "in

21  acting or omitting to act as he did . . . acted as a reasonably prudent man would have acted under the

22  same or similar circumstances . . . ." *Bratt v. Cnty. of Los Angeles*, 912 F.2d 1066, 1071 (9th Cir.

23  1990). A decision "made above board and justified in public is more likely to satisfy this test." *Id.* at

24  1072.

25

26  [9] SCVTA believes the undisputed facts in the record squarely support its motion for summary
    judgment on the good faith and willfulness issues. This is particularly true with respect to the issue
27  of willfulness – an issue on which Plaintiffs bear the burden of proof. But if the Court disagrees,
    these issues must go to trial.

28

SCVTA'S NOM AND MOT FOR SUMMARY JUDGMENT OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT, MPA –
CASE NO. 5:16-CV-02668-BLF

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    The record indisputably demonstrates good faith because SCVTA relied on a stipulated

2  judgment on the merits explicitly finding that SCVTA's conduct at issue in this case conformed

3  with the FLSA. SCVTA previously entered into a stipulated settlement with the plaintiffs in the *Rai*

4  litigation, which specifically stated that the claims in that case had been litigated and once approved

5  by the court, the stipulated settlement would constitute a final judgment on the merits. (Settlement.)

6  The *Rai* court approved the stipulated settlement in its final order and incorporated it into the final

7  judgment. (Spellberg Decl. ¶ 4, Exs. L, M, N.)[10]  The judgment approved the conduct that Plaintiffs

8  challenge here, finding that, "VTA produced substantial evidence that [start-end] travel time was

9  covered by the Portal-to-Portal Act and is therefore not compensable under the FLSA" and that

10 SCVTA "pays numerous premiums . . . which are not required by federal or state law and that equal

11 or exceed the amounts VTA would potentially pay based on Plaintiffs' claims for additional Split-

12 Shift Travel Time compensation." (Settlement §§ 6.3.7-8.)

13   Defendant's reliance on a federal court judgment finding that its conduct complied with the

14 requirements of the FLSA constitutes "good faith," if that term is to have any meaning at all.

15          **2.      Plaintiffs Cannot Prove Willfulness**

16   It is Plaintiffs' burden to show that VTA acted in a "willful" manner, thus extending the

17 statute of limitations from two years to three years. *McLaughlin v. Richland Shoe Co.*, 486 U.S.

18 128, 135 (1988). Willful violations occur when the employer knew that its conduct was prohibited

19 by the FLSA or showed reckless disregard for its requirements. *See id.* at 133. A "good-faith but

20 incorrect assumption that a pay plan complied with the FLSA" does not permit a finding of

21 willfulness. *Id.* at 135.

22   It is Plaintiffs' burden to show willfulness, and the showing is impossible given this record.

23 *See generally Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th

24 Cir. 2000) (where plaintiff bears burden of proof, defendant must either produce evidence negating

25

26 [10] As shown by the testimony of the Plaintiffs, SCVTA complied with paragraphs 6.3.7 and 6.3.8 of the settlement agreement by instructing the operators that they are not required to take public transit of SCVTA shuttles for start-end or split-shift travel and by further instructing them that the split shift constitutes their own free time with which they can do as they please. (Silva Depo. at 88:2-24, 89:22-90:2; Williams Depo. at 58:2-16; Butler Depo. at 26:5-14.)

27

28

1  the claim or show that the plaintiff cannot carry its burden; burden then shifts to the plaintiff to

2  produce evidence sufficient to create a genuine issue of material fact). The same evidence discussed

3  above with respect to good faith is equally applicable here. Plaintiffs cannot demonstrate that

4  SCVTA willfully violated the FLSA where, as here, a federal court judgment explicitly held that its

5  pay practices complied with the law.

6  **VI.    CONCLUSION**

7          For the reasons set forth above, the Court should award summary judgment to Defendant as

8  requested above. Defendant is not liable here for any additional amounts with respect to split-shift

9  travel time or start-end travel time.

10   Dated: September 13, 2018                     RENNE PUBLIC LAW GROUP LLP

11

12

13                                        By:_____/s/Geoffrey Spellberg_____
                                              Geoffrey Spellberg

14                                          Attorneys for Defendant
                                            SANTA CLARA VALLEY TRANSPORTATION
15                                          AUTHORITY

16

17

18

19

20

21

22

23

24

25

26

27

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

SCVTA'S NOM AND MOT FOR SUMMARY JUDGMENT OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT, MPA –
CASE NO. 5:16-CV-02668-BLF